## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOAN ESNAYRA | * | |
| Plaintiff | * | |
| vs. | * | Case No.:  1:05CV01501 |
| GEORGE WASHINGTON UNIVERSITY HOSPITAL, *et al.* | * | Judge: Colleen Kollar-Kotelly Deck Type: Personal Injury/ |
| | * | Malpractice |
| Defendants | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## DISTRICT HOSPITAL PARTNERS, L.P.'S RULE 26(a)(2) DISCLOSURE OF EXPERT OPINION REGARDING THOMAS KRAJEWSKI, M.D.

Thomas Krajewski, M.D.
1417 Autumn Leaf Road
Towson, Maryland 21286

### QUALIFICATIONS

I am an expert in the field of psychiatry and the Director of the Medical-Surgical Program at Spring Grove Hospital Center in Catonsville, Maryland. I am board-certified in the medical specialty of psychiatry. I have attached to this Disclosure Statement a copy of my Curriculum Vitae identifying in greater detail my areas of expertise, experience and qualifications.

### DOCUMENTS REVIEWED

I have reviewed Joan Esnayra's pertinent medical and psychiatric records, her therapy records, her employment records, the pertinent pleadings and discovery materials filed in this case, and various materials relating to Joan Esnayra that are available on the internet.  I intend to review the written transcripts and videotaped recordings from all depositions taken in this case in the future, and I have been asked to perform an independent psychiatric examination of Joan Esnayra.

### EXHIBITS

I may refer to specific medical and/or psychiatric records, therapy records, diagnostic films, pathology slides, medical literature, medical illustrations, employment records, internet

publications, deposition transcripts, videotaped depositions, or other items to support or explain my opinions. I may also write or draw on an art pad to support, illustrate or explain my opinions.

## OPINIONS

I reserve the right to supplement my opinions once I have had the opportunity to review the depositions of the parties and the fact and expert witnesses in this case, as well as any other medical records that are produced. I base the following opinions on my review of the medical and other records that have been provided to me for review. It is my understanding that no depositions have been taken as of the date of this report. All of my opinions are expressed to a reasonable degree of medical probability.

It is my opinion that the nurses and other staff at George Washington University Hospital fully complied with the applicable standards of care when Joan Esnayra presented to the emergency room on August 1, 2004. In addition, it is my opinion that nothing that happened or did not happen during Joan Esnayra's visit to the emergency room on August 1, 2004 caused any temporary or permanent, physical or psychological injury to her. The treatment rendered to her was, rather, entirely appropriate and therapeutically effective. There is no documentation that Ms. Esnayra resisted or refused the treatments in any way.

It is clear from the medical records that Ms. Esnayra presented to the emergency room in extreme physical pain. Under those circumstances, she was unable to sign the consent forms that were presented to her. It was appropriate to treat her in spite of her claimed inability to sign the consent forms. All of the medications that were given to Ms. Esnayra during her visit to the emergency room were appropriate for patients complaining of back pain, were not contraindicated in Ms. Esnayra's case, and were neither the type of medications nor of the requisite dosage to constitute a form of chemical restraint. Ms. Esnayra appeared to tolerate the medications without any type of adverse effect and there was no documentation that she, in any manner, was refusing these medications which did, in fact, relieve her pain. These medications were similar to those taken by Ms. Esnayra during previous hospitalizations without complaint.

It is clear from the medical records that Ms. Esnayra was neither abandoned nor abused during her visit to the emergency room, nor was her treatment in any way delayed. The medical records document that Ms. Esnayra was seen by multiple nurses and physicians during her brief visit, including a specialist in neurosurgery. There is absolutely nothing in the records that supports Ms. Esnayra's allegations of abuse. There is nothing to support her allegations of physical restraint.

Given the extreme discordance between the medical records and Ms. Esnayra's allegations, as well as Ms. Esnayra's long history of psychiatric problems, including bipolar disorder, dissociative episodes and Post Traumatic Stress Disorder, the events described by Ms. Esnayra did not appear to have occurred. It is a well-known medical fact that bipolar disorder can cause psychotic episodes, and that post-traumatic stress disorder can cause dissociative episodes. Post traumatic stress disorder can also cause a patient to conflate the events of one time period with those of another time period, such that the patient mistakenly believes that something that

-2-

happened to her in the past is actually happening in the present. Dissociative episodes and post traumatic stress disorder can also cause a gross misperception of reality, which likely occurred in Ms. Esnayra's case. Patients with histories similar to Ms. Esnayra's are even more likely to suffer psychotic breaks when they take large quantities of Marinol, a synthetic cannabinoid, as Ms. Esnayra regularly does.

It is my opinion that Ms. Esyanra either had a psychotic or dissociative episode on August 1, 2004, or else is malingering in the hopes of financial or other gain. It should be noted that Ms. Esnayra has been a plaintiff in multiple lawsuits involving allegations similar to the allegations at issue in this case. There is also a clear element of malingering, as evidenced by Ms. Esnayra's request that her therapist recommend her for discounted tickets to the Kennedy Center based on her alleged "disability."

With respect to Ms. Esnayra's claims that her civil rights were violated by the Defendants' alleged refusal to allow her "service animal" to accompany her into the emergency room, I find no basis whatsoever for this allegation in the medical records. Regardless, it is my opinion that so-called psychiatric service dogs are not recognized in the medical community to be of any therapeutic value in that there are no exhaustive peer-reviewed medical studies in the relevant psychiatric literature that endorse the use of psychiatric service dogs in the manner Ms. Esnayra suggests. Psychiatric service dogs are not the type of animal contemplated by the Americans with Disabilities Act. They do not actually provide any "services." Any testimony to the contrary would merely be anecdotal.

Moreover, psychiatric service dogs would constitute an exception to the Act in this case, as the presence of a dog in the emergency room would be extremely disruptive to the emergency room as a whole. Emergency rooms generally are crowded areas containing patients with open wounds, psychiatric issues, and elderly patients with cardiac problems. These patients are ambulatory, on stretchers and in wheelchairs. They are often attached to IVs and are connected to various machines by tubes and wires. Having a dog in the emergency room, whether on or off a leash, would compromise the hygiene and order of the emergency room and would quite likely cause anxiety to the patients, particularly when the dog is a very large Rhodesian Ridgeback, as Ms. Esnayra's dog was. It is also known that her dog was often uncontrollable and aggressive, as is clear from Ms. Esnayra's employment records.

Based on Ms. Esnayra's Complaint, she was in excruciating pain, which would have frustrated her ability to control the dog, even if it had been in the emergency room. Indeed, Ms. Esnayra's employment records are replete with complaints that she was unable to control the dog, even in non-emergency situations, and that the dog had an aggressive and frightful demeanor. Obviously, having such an animal in the emergency room would jeopardize the emergency room workers' ability to render care to the patients in an orderly and safe manner.

Regarding Ms. Esnayra's claim that she is "disabled" within the meaning of the Americans with Disabilities Act, I find no credible evidence that Ms. Esnayra is disabled. Bipolar disorder and post traumatic stress disorder generally do not prevent patients from leading fully functional lives; indeed, in Ms. Esnayra's case, she was able to earn a doctorate and enjoy a successful career in the sciences in spite of her medical history. The medical

-3-

Regarding Ms. Esnayra's claim that she is "disabled" within the meaning of the Americans with Disabilities Act, I find no credible evidence that Ms. Esnayra is disabled. Bipolar disorder and post traumatic stress disorder generally do not prevent patients from leading fully functional lives; indeed, in Ms. Esnayra's case, she was able to earn a doctorate and enjoy a successful career in the sciences in spite of her medical history. The medical records from her employer make clear that Ms. Esnayra's problems with employment did not stem from any disability on her part; to the contrary, those problems stemmed from her poor interpersonal skills and her obsession with establishing the legitimacy of the psychiatric service dog movement.

## BASIS AND REASONS FOR OPINIONS

I base my opinions on my review of Ms. Esnayra's medical and psychiatric records, her therapy records, her employment records, the pertinent pleadings and discovery materials filed in this case, and various materials relating to Joan Esnayra that are available on the internet. I also base my opinions on my education, training, and experience in this area, as reflected in my Curriculum Vitae attached hereto. I also intend to review depositions related to this case as they become available and may base my opinions on portions of those depositions.

## PUBLICATIONS AUTHORED IN THE PRECEDING TEN YEARS

My publications are listed in my Curriculum Vitae, attached hereto.

## COMPENSATION RATES

My fee for consultation is $300.00 per hour. My fee for deposition testimony is $300.00 per hour. My fee for Court appearance is $3000.00 per day plus travel expenses.

## CASES IN WHICH I HAVE GIVEN EXPERT TESTIMONY IN THE PRECEDING FOUR YEARS

2004 – James Ralph Nester v. Ashok Subramanian, M.D. and Jeff Tiongson, M.D.
2005 – Kevin Russo v. Charles Dick, M.D.
2006 – Misty Knock v. Gilbert Villabona, M.D.
2006 – Lawrence Levy v. Saint-Gobain Ceramics and Plastics

_____
Thomas Krajewski, M.D.

_____
Date

755569

-4-

Respectfully submitted,

_____

Thomas V. Monahan, Jr. (Fed. Bar #04471)
Adam Kelley (Fed. Bar #483729)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland   21202
(410) 783-4000
*Attorneys for District Hospital Partners,*
*L.P. d/b/a George Washington University*
*Hospital*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of April 2006, copies of District Hospital Partners, L.P.'s Rule 26(a)(2) Disclosure of Expert Opinion Regarding Thomas Krajewski, M.D., with Attachment, were sent to the following via first-class mail, postage prepaid:


Kay M. Clarke, Esquire
Clower & Clarke
601 Pennsylvania Avenue NW
The Pennsylvania, Suite 205
Washington, D.C.   20004

Matthew P. Maloney, Esquire
Gleason, Flynn, Emig & Fogelman
11 N. Washington Street, Suite 400
Rockville, Maryland 20850


_____
Adam Kelley

755569

Thomas F. Krajewski, M.D.
1417 Autumn Leaf Road
Towson, Maryland 21286

## Employment History

### October 1999-Present

**Position:**    **Vice President, Physician Advisor Services**

Physician Advisor Services is an independent review group that provides clinical consultation in cases related to utilization review, quality of care, and forensic issues. The physician advisor group has extensive experience in governmental, administrative, managed care, JCAHO, and forensic experience with all levels of psychiatric care on both a national and international basis.

### March 1995-December 1999

**Position:**    **Chief Psychiatric Consultant, ADVOCARE of Tennessee, a subsidiary of Magellan Health Services/Green Spring Health Services.**

The Chief Psychiatric Consultant is responsible for the outpatient and inpatient review for medical necessity and medical treatment in a managed care organization dealing with mental health and addiction services. The Chief Psychiatric Consultant is also responsible for the quality improvement and supervision of all clinical personnel within the subsidiary. The Chief Psychiatric- Consultant interfaces with the TENNCARE project, particularly, the Blue Cross and Blue Shield component of TENNCARE.

### From 1997-December 1999

**Position:**    **Senior Psychiatric Consultant to Magellan Health Services**

This position is responsible for four distinct functions. The first is a quality improvement manager on a nation-wide basis for local operating units. This function entails special audits, reviews and projects all relating to quality improvement.

The position also has the responsibility for nation-wide appeals. This is the final level of decision making in any quality of care issue, as well as authorization for services. This position also has the responsibility for providing start-up consultation and training to local operating units who have been recently awarded contracts. This may entail off-site or on-site of supervision of staff at all levels, including the training of permanent staff for continuous operations.

Finally, numerous special assignments are performed by this position. This includes special consultation training and quality improvement services for those units experiencing difficulties in these areas. These special assignments are on a nation-wide basis and vary from month to month.

## 1992- 2001

**Position:    Psychiatric Consultant to Medicare or Maryland**

This ad hoc position is responsible for providing periodic consultation services in areas of quality improvement, policy, chart review, and overall compliance with Medicare regulations. This role also includes educational services and meetings with designated Medicare facilities concerning the above areas of review.

## March 19995- 1997

**Position:    Associate Medical Director, Green Spring Mental Health Services for the TAO subsidiary.**

This position was responsible for the supervision of the senior clinical management of the TAO (Eastern Pennsylvania) subsidiary of Green Spring Mental Health Services. These responsibilities include the monitoring and supervision of the clinical and utilization review care in a managed care organization with both utilization review and direct care management responsibilities. This essentially was a consultation role during the start-up of the TAO subsidiary, which was later called Green Spring of Eastern Pennsylvania.

## June 1992- March 1994

**Position:    Acting Medical Director, Green Spring Mental Health Services of New Jersey.**

The position of Medical Director supervises both the direct care management as well as the utilization review operations of the Green Spring subsidiary of New Jersey. This involves direct supervision of all clinical staff, including quality performance improvement areas as well as quality assurance. This position interfaced with the Blue Cross and Blue Shield of New Jersey program as the managed care component for their psychiatric and addiction services.

## April 1989 to Present

**Position:    Chief of Geropsychiatric Services, State of Maryland**

This position is responsible for the coordination and direction of the psychiatric services provided to the geriatric population in the State of Maryland. This includes project monitoring; including coordination of the Nursing Home Reform Act, and the nursing home transfer intiative. In addition, this position serves as a special consultant to the elderly population of the State of Maryland who present with complicated mental health and medical problems. The position is also responsible for the development of policy and services serving the mental health needs of elderly in the state of Maryland. The Chief is

also the special advisor to the Director of Mental Hygiene Administration for Services for the Elderly.

**April 1989 to Present**

**Position:     Director of the Medical/Surgical Psychiatric Program, Spring Grove Hospital Center, Catonsville, MD.**

This includes special consultation to wards with complex clinical problems. This specific service division cares for the elderly, psychiatrically ill population, as well as acute psychiatric patients with medical/surgical problems. The position also is responsible for the direct acute psychiatric care of the medical/surgical unit that provides services for patients who are dually diagnosed with acute psychiatric as well as concomitant medical problems.

**July 1987- April 1988**

**Mental Hygiene Administration**
**201 West Preston Street**
**Baltimore, MD 21201**

**Position:     Director of Clinical Programs**

This position supervises the Directors of each of the geographic (Eastern, Western, Southern and Central) regions and the Director in charge of forensics. The Director of Clinical Programs is in charge of all inpatient and outpatient, psychiatric and psychosocial programs for the Mental Hygiene Administration of Maryland

**January 1986- July 1987**

**Department of Health and Mental Hygiene**
**201 West Preston Street**
**Baltimore, MD 21201**

**Position: Acting Assistant Secretary for Mental Health, Mental Retardation, Developmental Disabilities, Drug and Alcohol Addiction Programs**

This position is the chief administrator of the following programs: Mental Hygiene Administration, the Mental Retardation Developmental Disabilities Administration, the Alcohol Control Administration, and the Drug Abuse Administration. This position has the responsibility for overseeing such programs and coordinating their efforts, as well as establishing public policy for the services provided in these programs.

**January 1984-July 1987**

**Department of Health and Mental Hygiene**
**201 West Preston Street**
**Baltimore, MD 21201**

**Position:**     **Chief Medical Advisor for the Department of Health and Mental Hygiene.** (This is a continuation of the same position that was held since June, 1984).

**June 1984-January 1986**

**Department of Health and Mental Hygiene**
**201 West Preston Street**
**Baltimore, MD 21201**

**Position:**     **Assistant Secretary for Health**

Senior Medical Advisor for State Department of Health and Mental Hygiene has policy and management responsibility for: Preventive Medicine administration; Office of Chronic and Rehabilitation Facilities (including four hospitals); Laboratories Administration; Local Health Administration; Juvenile Services Administration; and Post-Mortem Examiners. The first three months in this position were held in an acting capacity.

**November 1980- June 1984**

**Springfield Hospital Center**
**Sykesville, MD 21784**

**Position:**     **Superintendent**

Chief Executive Officer of a 1,200-bed hospital which provides inpatient psychiatric services from acute to rehabilitative in nature. This position entailed full authority and responsibility over both non-clinical and clinical matters, policy issues, community liaison assurance and program evaluation for the hospital center. (The first five months in this position was spent in an acting capacity).

**April 1980-November 1980**

**Springfield Hospital Center**
**Sykesville, MD 21784**

**Position:**     **Clinical Director**

Director of Clinical Services for a 1,400-bed hospital responsible for a full range of inpatient psychiatric care for severely disturbed individuals. Springfield Hospital serves

approximately 1.3 of the population of the State of Maryland. This entailed management responsibility for approximately 1,000 clinical staff member, including the provision of direct consultation to staff regarding significant clinical issues.

**1979-1980**

**Springfield Hospital Center**
**Sykesville, MD 21784**

**Position:**        **Assistant Division Director- Tri-County Unit**

Chief Administrative Officer for a 120-bed unit serving a population of approximately 600,000 citizens in the state of Maryland. This position included the direction and coordination of all clinical and non-clinical affairs pertaining to the unit as well as developing liaison with the various community mental health services and integrating them into a network which would provide continuity of care from the acute inpatient phase through the convalescent outpatient phase.

**1978-1980**

**Springfield Hospital Center**
**Sykesville, MD 21784**

**Position:**        **Director of University Maryland Residency Training Unit**

This position entailed the creation and direction of the first training unit in the Maryland state hospital system for university psychiatric residents. Known as The Maryland Plan, this process was internationally acclaimed for the training and recruitment of psychiatric residents for the purpose of serving the most seriously ill and disadvantaged citizens of the state of Maryland.

**1978-Present**

**Private Practice**
**606 Baltimore Avenue**
**Towson, MD 21204**

General psychiatric pratice with special emphasis on forensics, geriatrics, psychopharmacology and hypnosis.

**1977-1978**

**University of Maryland School of Medicine**
**Institute of Psychiatry and Human Behavior**
**655 West Baltimore Street**
**Baltimore, MD 21201**

**Position:**     **Chief Resident- Chief Outpatient and Liaison Divisions**

Management responsibility for outpatient psychiatric services and liaison psychiatric services at the University of Maryland Hospital Center. This position involved the organization and implementation of a psychiatric residency training program interfacing with both outpatient and liaison services. It also included responsibility for the direction of emergency psychiatric services for the University of Maryland Hospital.

**1977**

**University of Maryland School of Medicine**
**655 West Baltimore Street**
**Baltimore, MD 21201**

**Position:**     **Director, Group Therapy Clinic**

This position involved the coordination of psychiatric group therapy clinic service which involved appropriate screening and provision of the therapy.

**Education**

1966-1970

Loyola College, Baltimore, MD
Degree Received: B.S.
Awards:        Dean's List, TriBeta National Biological Society

1971-1975

University of Maryland School of Medicine, Baltimore, MD
Degree Received:     M.D.

1975-1978

University of Maryland School of Medicine, Baltimore, MD- Psychiatric Residence at the Institute of Psychiatry and Human Behavior.

## Memberships

American Psychiatric Association
American Society of Clinical Hypnosis
Maryland Gerontological Association
Maryland Psychiatric Association,
        Chairperson, Public Affairs Committee
American Board of Psychiatry and Neurology, Certified,
        American Medical Association
Carroll County Medical Society
Medical and Chirurgical Faculty of the State of Maryland
Baltimore County Medical Society- Affiliate
Fellow of American Psychiatric Association

## Professional Committees

Committee for the Maryland Psychiatric Foundation
Public Affairs Committee, Maryland Psychiatric Society, Chairman
Legislative Committee, Maryland Psychiatric Society, Member
Peer Review Committee, Maryland Psychiatric Society, Member
Legislative Committee, Medical and Chirurgical Faculty, Member
Committee on Emotional Health, Medical and Chirurgical Faculty, Member
Professional Advisory Board, Mental Health Association, Member
Governor's Task Force on AIDS, Member
Governor's Commission of Black and Minority Health, Chairman,
        Task Force on Mental Health
The Maryland Post Mortem Examiners Commission
APA Committee of the Chronically Mentally Ill

## National Presentations

May, 1979- "Family Therapy with Psychiatric Inpatient," a panel given at the American Psychiatric Association Annual Meeting in Chicago, Illinois.

October, 1979- "Inpatient Family Therapy," a course presented at the Annual Meeting of the American Association of Marital and Family Therapists, Washington, DC.

October, 1979- "Psychiatric Care for the Geriatric Patient," a conference of the Baltimore City Geriatric Evaluation Service.

May,1980- "Inpatient Family Therapy," paper presented at the American Psychiatric Association's National Conference, San Francisco, California.

May,1980- "Family Therapy with Psychiatric Inpatients," course given at the America Psychiatric Association's National Conference, San Francisco, California.

May, 1980- "University/State Alliance," symposium presented at American Psychiatric Association's National Conference, San Francisco, California.

October, 1980- "Psychiatric Abuse of the Elderly," American Psychiatric Association's National Conference, New Orleans, Louisiana.

May, 1981- "Sexual Rights of Psychiatric Inpatient," American Psychiatric Association's National Conference, San Francisco, California.

July, 1983- "Upgrading State Mental Hospitals," a panel given at the World Congress for Mental Health, Washington, DC.

July 1983_ "A Progressive American State Mental Hospital," a presentation given during the tour of the World Congress for Mental Health, Sykesville, Maryland.

January, 1984- "The Goal of an Efficient State Hospital in a Mental Health System," testimony given before the Governor's Select Committee for the Reorganization of the New York State Mental Health System.

April, 1985- "State Psychiatric Hospitals," ABC Nightline.

October, 1985- "The AIDS Phobia in the Nursing Homes Industry," American Health Care Association, Honolulu, Hawaii.

March, 1986- ""AIDS Phobia in Schools," CBS TV, Night Watch.

September, 1987- National Governor's Association Office of State Services Seminar on AIDS, Washington, DC.

October, 1987- The Government and Consumer Relationship in Mental Health Services, World Congress of Mental Health, Cairo, Egypt.

## Publications

A.    Inpatient Family Therapy, International Journal of Family Therapy, Vol. 1, No. 4, 1980, International Universities Press, Inc., New York, New York

Psychogenic Regurgitation: A Specific Entity and Suggested Treatment, Journal of Behavioral Therapy and Experimental Psychiatry, Vol. 11, pps. 263-266

Psychiatric Manpower and Public Mental Health: Maryland's Experience, Hospital and Community Psychiatry, Vol. 33, No. 4, April 1982, Henry T. Harbin, M.D.; Walter Weintraub, M.D.; Gary W. Nyman, M.D., M.B.A.: Alp Karahasan, M.S., Ph.D.; Jonathan Book, M.D.; and Thomas F. Krajewski, M.D.

The Maryland Plan for Recruiting Psychiatrists into Public Service, <u>The American Journal of Psychiatry</u>, Vol 141, No. 1: 91-91, Walter Weintraub, M.D.; Henry T. Harbin, M.D.; Jonathan Book, M.D.; Gary W. Nyman, M.D., M.B.A.; Alp Karahasan, M.D., Ph.D.; Thomas F. Krajewski, M.D.; Bruce Regan, M.D.

Effective Short-Term Treatment of Generalized Anxiety Disorder with Trifluoperazine, Mendels, J., Krajewski, T.F., M.D. et al.: <u>J. Clin. Psychiatry</u> 47:170 (Apr. 1986)

Psychotropic Medication for Elderly Patient: Use with Caution, <u>Maryland Medical Journal,</u> November, 1986, Paul E. Ruskin, M.D.; Gary W. Nyman M.D.; Thomas F. Krajewski, M.D., pp. 939-940

A System for Patient's Rights Advocacy in State Psychiatric Inpatient Facilities in Maryland, <u>Hospital and Community Psychiatry,</u> Thomas F. Krajewski, M.D. and Carolyn Bell, MSW, 43:2 (Feb. 92)

B.    Systems of Treatment for the Mentally Ill: Filling the Gaps by Richard E. Gordon and Katherine K. Gordon, reviewed by Thomas F. Krajewski, M.D., in the <u>Journal of Nervous and Mental Disease,</u> Vol. 171, No. 8, Printed in the U.S.A.

The Chronic Mentally Ill: Treatment, Programs, Systems by John A Talbot, Human Sciences Press, New York, 1981 pp. 374, review by Thomas F. Krajewski, M.D. in the <u>Journal of Nervous and Mental Disease,</u> Vol. 173, No. 3

C.    The Family Changes the Hospital, <u>The Psychiatric Hospital and the Family,</u> 7: 143-156, 1982, Spectrum Publication, New York

D.    Elder Interventions: A Guide to Caring for the Elderly with Behavior and Emotional Problems, Thomas F. Krajewski, M.D. AuthorHouse,   2006